**SO ORDERED.**

**SIGNED this 28 day of September, 2011.**

_____
**J. Rich Leonard**
**United States Bankruptcy Judge**

_____

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF NORTH CAROLINA**
**WILMINGTON DIVISION**

**IN RE:**

**SMITHVILLE CROSSING, LLC,**                    **CASE NO. 11-02573-8-JRL**
                                                 **CHAPTER 11**

   **DEBTOR.**

---

## ORDER

This matter came before the court on various motions filed by both Smithville Crossing, LLC ("debtor") and Rialto Real Estate Fund, LP ("Rialto"). Specifically, the debtor filed a motion to employ an accountant at a flat rate fee on May 25, 2011. Rialto filed a motion to disgorge the retainer held by the debtor's counsel on June 9, 2011. The debtor filed a response to that motion on June 27, 2011. Rialto then filed a motion for relief from the automatic stay or in the alternative a motion to dismiss the debtor's case on June 13, 2011. On July 7, 2011, the debtor filed a response to that motion and its own motion directing Rialto to turn over property of the debtor's estate. Rialto filed a response to that motion on July 22, 2011. A three day hearing on these matters was held on August 1, 2011, August 18, 2011, and August 26, 2011 in Raleigh, North Carolina.

## JURISDICTION

This bankruptcy court has jurisdiction over the parties and the subject matter of this proceeding pursuant to 28 U.S.C. §§ 151, 157, and 1334, and the General Order of Reference entered by the United States District Court for the Eastern District of North Carolina on August 3, 1984.  All of these matters are core proceedings within the meaning of 28 U.S.C. § 157(b)(2), which this court may hear and determine.

## FACTS

The debtor is a North Carolina limited liability company, and engaged in the business of leasing retail shopping space in Southport, North Carolina.   Pursuant to 11 U.S.C. § 101(51B) the debtor is also a single-asset real estate debtor.  The debtor's sole income is generated from the collection of rents from tenants leasing the shopping space in Southport, North Carolina. Rialto is the successor-in-interest to Branch Banking and Trust Company ("BB&T"), the original lender and holder of a promissory note executed by the debtor.

BB&T loaned $5,102,377.00 to the debtor to purchase and construct improvements on retail property located in Brunswick County, North Carolina as evidenced by a promissory note ("the note") dated October 4, 2006.  The note was later modified on April 7, 2008 and February 23, 2009.  The note matured on July 25, 2009.  As security for the note, the debtor executed a deed of trust in favor of BB&T.  The deed of trust encumbers the property and further assigns to the beneficiary all future rents and profits from the property as additional security.  The debtor also executed an assignment of leases and rents agreement ("assignment of rents") in favor of BB&T as additional security on October 4, 2006.  The assignment of rents provides that the debtor

hereby absolutely assigns and transfers to Assignee: (a) the income, rents (including, if applicable, all hotel room rents), receivables, security or similar deposits, revenues, issues, royalties, profits, earnings, products and proceeds from any and all of the Property . . . together with the right, power, and authority to collect the same; . . . [the debtor] irrevocably appoints Assignee its true and lawful attorney-in-fact, at any time and from time to time, at the option of the Assignee, to demand, receive and enforce payment of rent . . . and to apply the same to the indebtedness secured; provided, however that [the debtor] shall have the right and license to collect the rents, issues, and profits prior to any event of default[.]

The debtor defaulted under the note, deed of trust, and assignment of rents (collectively, the "loan documents") by failing to make payments as they became due and by failing to pay the note in full by July 25, 2009, the note's maturity date. On September 30, 2010, BB&T notified the debtor that the debtor was in default under the loan documents and that BB&T was also exercising its right to accelerate the balance under the terms of the loan documents. BB&T did not exercise its right to collect rental income generated by the property through the letter. On November 24, 2010 BB&T sent a letter to the tenants of the property stating that BB&T was entitled to collect all of the tenants' rents under the terms of their leases with the debtor and demanded that all payment be made directly to BB&T. The debtor was copied on this correspondence to the tenants. After receiving this notice, most of the tenants began making payments directly to BB&T. One tenant continued to make payments to the debtor. The debtor's member manager, Glenn Richardson, testified that one tenant made its payments by a direct deposit each month from its account into the debtor's account. Mr. Richardson also testified that at some point after the November 24, 2010 letter, he deposited all of the rents he subsequently received into a BB&T bank account. BB&T was authorized to debit the account. However, there was no evidence presented that BB&T ever debited the account after sending the November 24, 2010 letter.

3

At the hearing, Rialto presented evidence that tended to show that between November 17, 2010 and January 21, 2011 Mr. Richardson caused the debtor to make payments to himself in the amount of $15,000.00 as an equity draw. This money was paid from the tenant rent payments. Rental payments were also used by the debtor to pay Mr. Richardson a management fee in the amount of $8,000.00 on January 5, 2011. The debtor also paid First Marketplace Realty, LLC, an entity owned and managed by Mr. Richardson, a $2,000.00 management fee on March 1, 2011.

It is undisputed that on March 1, 2011 the debtor paid a retainer of $40,000.00 to its counsel. On March 3, 2011 BB&T executed an allonge, an assignment of loan documents, an assignment of security interests and an assignment of the assignment of rents to Rialto effective as of February 25, 2011. Counsel received an additional payment of $10,000.00 from the debtor on or about March 28, 2011.[1] On March 30, 2011 Rialto filed a complaint and application to appoint a receiver in Brunswick County, North Carolina Superior Court. The debtor filed a petition for relief under chapter 11 of the Bankruptcy Code on April 1, 2011.

At the hearing, Rialto's expert appraiser testified that in his opinion the current market value of the property is $2,500,000.00. Included in his valuation was an out-parcel of vacant land located on the property that he valued at $200,000.00. Mr. Richardson testified that the

---

[1] The debtor's motion indicates that this portion of the retainer was erroneously coded as a retainer for Mr. Richardson individually, and not the debtor, in counsel's trust account. This portion of the retainer was mistakenly applied to attorney fees and expenses for the benefit of Mr. Richardson, individually. Mr. Richardson was made aware of this, and agreed to immediately pay $5,673.14 to counsel's trust account, for the benefit of the debtor. The debtor's counsel also agreed to recode the remaining $3,287.86 to make clear that it was being held in trust for the benefit of the debtor. The debtor and Rialto agree that the debtor's counsel is currently holding approximately $45,100.12 in trust for the debtor.

vacant land was essentially worthless because the department of transportation would require costly changes to the road before the parcel could be used for commercial purposes. Rialto's financial expert testified at the hearing as to how the current market would price a loan to the debtor. Essentially, his testimony established that there is no effective market for this loan. He testified that the true interest rate for the debtor's plan would be between 11-12% and amortized over 20 years. Based on these rates, in his expert opinion the debtor's plan would not be feasible.

Mr. Richardson testified that since filing for bankruptcy the debtor has not lost a single tenant. He testified that the debtor has gained two new tenants since the filing of the debtor's bankruptcy petition, and that he has been talking with prospective tenants. The debtor entered into evidence several exhibits outlining its proposed plan projections. Under every scenario presented the debtor would use the stream of net rental payments coming in each month from the tenants to fund its plan. The parties stipulated that all rents are property of the estate and are Rialto's cash collateral as defined by 11 U.S.C. § 363(a). Mr. Richardson also testified that he was very interested in helping the debtor reorganize.

## DISCUSSION

## MOTION TO DISGORGE RETAINER

Rialto seeks disgorgement of the retainer received by counsel to represent the debtor. The debtor and Rialto both agree that the retainer currently held by counsel and all post-petition rents are property of the estate, subject to Rialto's security interest, and constitute Rialto's cash collateral as defined by 11 U.S.C. § 363(a). At the hearing, Rialto conceded that the assignment of rents was intended to be additional security and did not constitute an absolute right to use the

rents.  Rialto maintains that the debtor violated the deed of trust and assignment of rents agreements ("the agreements") by funding counsel's retainer with rental income derived from the property, and that this violation of the agreements constitutes grounds for disgorgement.  The debtor argues that it did not violate the agreements by continuing to collect and use the rents post-default when the lender failed to affirmatively exercise its rights under the agreements.  Thus, the issue is whether the debtor's funding of counsel's retainer was a breach of the agreements or a permissible use of rents.

Pursuant to the agreements the debtor had an absolute right to collect and use the rents pre-default.  The deed of trust reads in pertinent part that, "[the debtor] may continue to collect and retain the rents and profits without any accountability to Beneficiary."  The assignment of rents states in a similar vein that, "[the debtor] shall have the right and license to collect the rents, issues, and profits prior to any event of default[.]"

Rialto argues that upon default the debtor no longer had an absolute right to use the rents.  The agreements contain provisions setting forth what rights the beneficiary may exercise at its option upon the debtor's default.  The deed of trust clearly and unambiguously states,

> RENTS AND PROFITS. [The debtor] hereby assigns to Beneficiary all future rents and profits from the Property as additional security for the payment of the Debt, and for the performance of all obligations secured by this Deed of Trust, [the debtor] hereby appoints Beneficiary as [the debtor's] attorney-in-fact to collect any rents and profits, with or without suit, and **as Beneficiary may desire**.  Such appointment of Beneficiary shall be a power coupled with an interest and shall remain in full force and effect as long as any portion of the Debt remains outstanding.  However, until default under the Note or other Document or under this Deed of Trust, [the debtor] may continue to collect and retain the rents and profits without any accountability to Beneficiary**.  Beneficiary's election to pursue the collection of the rents or profits **shall be in addition** to all other remedies which Beneficiary might have and **may be** put into effect independently of or concurrently with any other remedy. (emphasis added).

6

. . .

REMEDIES OF BENEFICIARY UPON DEFAULT. Beneficiary **may request** the appointment of a Receiver for the Property and [the debtor] hereby consents thereto. If foreclosure proceedings are instituted under the this Deed of Trust, Trustee is hereby authorized to take possession of the Property and collect any rental, accrued or to accrue; or Trustee may lease the property or any part thereof, receive the rents and profits therefrom, and hold the proceeds remaining after payment of the expenses of managing and operating the property subject to the order of the court for the benefit of Beneficiary pending final disposition of the foreclosure proceedings, and during any period allowed by applicable law for the redemption from any foreclosure sale ordered in such proceedings; and Trustee may act irrespective of the value of the Property or its adequacy or inadequacy to secure or discharge the indebtedness then owing. (emphasis added).

Pertinent language in the assignment of rents reads:

At any time and for any reason the [debtor] shall have the right and obligation to collect and receive at the time of but not prior to, the date provided for the payment thereof, all rents, issues and profits arising under the Leases. Upon the occurrence of an event of default hereunder or under the Loan Documents, **[the beneficiary] may, at its option**, without notice and without regard to the adequacy of the security for the indebtedness, either in person or by agent with or without bringing any action or proceeding, or by a receiver appointed by a court, take possession of the premises described in any Lease or in the Deed of Trust and have, hold, manage, lease and operate the same on such terms and for such period of time as **the [beneficiary] may** deem proper and either with or without taking possession of such premises in its own name, demand, **sue for or otherwise collect and receive all rents, issues and profits of the Property** . . . (emphasis added).

Here, the deed of trust and assignment of rents' language are clear. The beneficiary may, but is not required to, collect rents from the debtor's tenants upon the debtor's default. In order to exercise that right the beneficiary must take affirmative action. The debtor defaulted on the note on July 25, 2009 when it failed to pay the balance of the note on its maturity date. Over a year later on September 30, 2010, BB&T notified the debtor by letter that it was in default and that BB&T would be accelerating the debt. Importantly, the letter did not direct the debtor to cease collecting the rents or instruct the tenants to pay the rents to BB&T, or inform the debtor

that it would be liable for any rents collected.  On November 24, 2010, BB&T notified the tenants of the property by letter that it was demanding rental payments.  BB&T copied the debtor on this correspondence to the tenants.  After this letter, the debtor deposited the rents into a BB&T bank account.  Even though BB&T was authorized to debit the debtor's BB&T bank account, at no point did BB&T debit the bank account after the November 24, 2010 letter.  BB&T later assigned its interest to Rialto.  On March 1, 2011 the debtor paid a retainer to its counsel.  Then on March 30, 2011, Rialto filed a state action to appoint a receiver.

Based on these facts, it is clear that BB&T, the original lender and beneficiary under the loan documents, did not exercise its rights upon the debtor's default.  Neither the deed of trust nor assignment of rents contains a provision setting forth what happens when the debtor defaults and the beneficiary takes no action to enforce its rights.  Therefore the issue becomes whether the debtor may continue to collect and use the rents when there has been a default and the beneficiary has not exercised its rights under the agreements.  The court in In re Harvest Oaks Drive Associates, LLC, No. 10-03145-8-SWH, 2011 Bankr. LEXIS 2044 (Bankr. E.D.N.C. Aug. 29, 2011), addressed this very issue.  The court stated,

> the Assignment sets forth what rights Lender may exercise concerning rents, at its option, upon default. But, what it does not do is set forth what happens upon default if the Lender chooses not to exercise its option to collect rents, does not enforce its right to turnover of rents collected by the debtor, and does not direct the debtor specifically concerning what expenses the debtor may pay. The question, then, is whether, on these facts, the debtor was precluded by the Deed of Trust and Assignment, upon default, from using cash collateral to pay for legal fees incurred in connection with its inability to service its loan and its preparations for filing a bankruptcy petition, such that it should be ordered to disgorge the retainer held by its Counsel.

Id. at *25-26.  The court held that based on the language found in the loan documents the debtor was permitted to use rents post-default to pay ordinary and necessary expenses of owning and

operating the property.  Id. at 28.  The court found that paying the counsel's retainer constituted an ordinary and necessary expense of operating the property.  Id. at 29.

Here, the language clearly states that pre-default the debtor can collect and use the rents. Upon default the beneficiary has remedies that it may pursue.  In order to exercise these remedies the beneficiary must take affirmative action.  In this case, the beneficiary did not take steps to exercise those rights.  Similar to Harvest Oaks, the deed of trust and assignment of rents do not contain provisions precluding the debtor from continuing to collect and use the rents. Here, the deed of trust and assignment of rents do not contain provisions instructing the debtor what it may do with the rents when the beneficiary does not exercise its rights post-default.  In the absence of contrary language, the court finds that the debtor was permitted to use and collect the rents when the beneficiary failed to exercise its rights under the agreements.  Therefore the debtor's payment of the retainer to counsel was not a violation of the parties' agreements. Rialto's motion to disgorge the retainer is **DENIED**.

## MOTION TO DISMISS

Rialto argues that the debtor's case was not filed in good faith and should therefore be dismissed for cause.  Section 1112(b) of the Bankruptcy Code authorizes the court to dismiss a chapter 11 case "if the movant establishes cause." 11 U.S.C. § 1112(b)(1).  A lack of good faith by the debtor in filing a petition constitutes cause for dismissal under § 1112(b) of the Bankruptcy Code.  See In re Winshall Settlor's Trust, 758 F.2d 1136, 1137 (6th Cir. 1985) ("[G]enerally, an implicit prerequisite to the right to file [a chapter 11 petition] is 'good faith' on the part of the debtor, the absence of which may constitute cause for dismissal[.] . . .").  The Fourth Circuit has adopted a two-pronged test to determine whether a chapter 11 petition was

9

filed in good faith.  Under this test, the movant must show "both objective futility and subjective

bad faith . . . in order to warrant dismissals for want of good faith in filing." <u>Carolin Corp. v.</u>

<u>Miller</u>, 886 F.2d 693, 700-01.  The <u>Carolin</u> court explained that

> [t]his means that if the only question raised is whether a reorganization is
> realistically possible, i.e., if there is no question of the petitioner's subjective good
> faith in filing, threshold dismissal of the petition is not warranted. In those
> circumstances the question of ultimate futility is better left to post-petition
> developments. By the same token, even if subjective bad faith in filing could
> properly be found, dismissal is not warranted if futility cannot also be found.

<u>Id.</u> at 701.  When considering whether to dismiss a case for want of good faith the court should

exercise "great care and caution" and look to the totality of the circumstances .  <u>Id.</u> at 700-01.

First, the court will consider the debtor's motivation for filing its bankruptcy petition.

Subjective bad faith is present when the petitioner's motive for filing is to abuse the bankruptcy

process and to invoke the automatic stay without the intent or ability to reorganize.  <u>See</u> <u>Carolin</u>

at 702 (The subjective bad faith inquiry is used "to determine whether the petitioner's real

motivation is to abuse the reorganization process and to cause hardship or to delay creditors by

resort to the Chapter 11 device merely for the purpose of invoking the automatic stay, without an

intent or ability to reorganize his financial activities."(internal citations omitted)).  In <u>Carolin</u> the

debtor committed several acts that permitted an inference of a bad faith filing.  The day before

the scheduled  foreclosure sale, a holding company was formed to purchase all of the debtor's

stock on the day of the foreclosure sale. <u>Id.</u> at 703.   Less than one hour before the foreclosure

sale, the holding company caused the debtor to file a chapter 11 petition.   <u>Id.</u>  In addition, the

debtor refused to preserve the creditor's rights throughout the bankruptcy proceedings, failed to

make reasonable efforts to secure substitute tenants for the property, and filed to make repairs

and restore the business to a "viable state." <u>Id.</u> at 704.  Based on the totality of the circumstances

the Carolin court held that the debtor's filing was made to abuse the bankruptcy process and thus constituted subjective bad faith on the debtor's part.  Id. at 705.

Rialto argues the debtor's filing of the chapter 11 petition was made in subjective bad faith.  In support of its argument Rialto contends that the debtor filed its chapter 11 petition in response to Rialto's motion to appoint a receiver in state court. Thus Rialto maintains that the debtor's filing was made for the sole purpose of evading state court litigation.  Rialto also asserts pre-petition bad faith on the part of the debtor.  Rialto contends that BB&T notified the debtor that it was in default under the loan and at that time BB&T's rights in the rents vested. The debtor continued to collect the rents in violation of BB&T's rights.  In addition, Rialto argues that the debtor paid Mr. Richardson a management fee and a retainer to its counsel with rent proceeds in direct violation of BB&T's rights.   Finally, Rialto argues that Mr. Richardson has an equity interest in the debtor and that he is trying to retain that interest to the detriment of the secured creditor.

The debtor contends that it has been making a good faith effort to reorganize and rehabilitate its existing enterprise.  Mr. Richardson testified at the hearing that he has been actively managing the debtor and working to keep current tenants and securing future ones. Since filing for bankruptcy the debtor has not lost any tenants and has gained two new tenants. Mr. Richardson has also tried to cut expenses.  In addition, he has also maintained the CAM, taxes, and insurance accounts on behalf of the debtor throughout the bankruptcy proceedings. Even Rialto's appraiser agrees with Mr. Richardson that the property is well-maintained and its physical condition is not deteriorating.

The court finds that this case is distinguishable from Carolin.  The debtor in this case has

11

not acted in such a way to suggest that it filed its petition to abuse the bankruptcy process.  The court finds that based on the totality of the circumstances, the debtor demonstrated good faith in filing its petition.  Notably, the debtor's filing was not in bad faith just because it was filed in response to state court litigation.  A last minute filing is not dispositive on the issue of a bad faith filing.  See In re McStay, 82 B.R. 763, 768 (Bankr. E.D. Pa. 1988) ("It is quite common and not inappropriate for a debtor to use chapter 11 to obtain a respite from a creditor or creditors aggressively seeking to collect on a debt, even when execution is imminent[.] . . .").  The debtor was simply trying to save its business which is something that many others are trying to do in this hard economic time.  Therefore, the court finds that there is insufficient indicia of subjective bad faith on the part of the debtor.

Since the second prong cannot be satisfied the court does not need to address the objective futility requirement.  Based on the foregoing, the motion to dismiss is **DENIED**.

## MOTION FOR RELIEF FROM THE AUTOMATIC STAY

Rialto contends it is entitled to relief from the automatic stay pursuant to §§ 362(d)(1) and (2) of the Bankruptcy Code.  Section 362 of the Bankruptcy Code provides that a debtor's bankruptcy petition automatically stays "any act to obtain possession of . . . or to exercise control over property of the estate," as well as "any act to collect . . . or recover a claim against the debtor that arose before the commencement of the case . . . ." 11 U.S.C. § 362(a).  However, the court may terminate the automatic stay – (1) for cause; (2) if the debtor has no equity in the property and the property is not necessary to an effective reorganization; or (3) in a single asset

real estate case,[2] 90 days after filing unless the plan of reorganization "has a reasonable possibility of being confirmed within a reasonable time," or if the debtor "has commenced monthly payments that are in an amount equal to interest . . . on the value of the creditor's interest in the real estate." Id.

Rialto argues that relief from the automatic stay should be granted under § 362(d)(2) of the Bankruptcy Code because there is no equity in the property and the property is not necessary for an effective reorganization.  Both the debtor and Rialto agree that the deed of trust and assignment of rents constitute a valid, perfected, and enforceable security interest as defined by § 552(b) of the Bankruptcy Code, and are not subject to any defense by the debtor.  The debtor and Rialto stipulated that the amount of Rialto's claim exceeds the fair market value of the property.  As such, there is no equity in the property. At the hearing, Rialto's appraiser testified that the current market value of the property is $2,5000,000.00.  Mr. Richardson testified that Rialto's appraiser included in his appraisal a tract of vacant land that is essentially worthless.  The court accepts Rialto's appraisal but will discount it by $200,000.00, the value the appraiser attributed to the vacant lot, based on Mr. Richardson's testimony.  Therefore the value of the property is $2,300,000.00.  Rialto filed a claim in this case for approximately $4,600,000.00.  Rialto is thus unsecured in the amount of approximately $2,300,000.00.  Rialto has met its burden of proving there is no equity in the property.

The next issue is whether the property is necessary for an effective reorganization. Rialto argues that the debtor will be unable to propose a feasible plan at the confirmation

_____

[2] Despite the fact that this is a single asset real estate case, § 362(d)(3) is presently inapplicable because the parties did not raise this issue at the hearing or in their motions.

hearing. The Supreme Court stated in United Savings Association v. Timbers of Inwood Forests Associates, Limited, 484 U.S. 365, 375-76 (1988),

> [o]nce the movant under § 362(d)(2) establishes that he is an undersecured creditor, it is the burden of the *debtor* to establish that the collateral at issue is "necessary to an effective reorganization." What this requires is not merely a showing that if there is conceivably to be an effective reorganization, this property will be needed for it; but that the property is essential for an effective reorganization *that is in prospect*. This means, . . . that there must be "a reasonable possibility of a successful reorganization within a reasonable time." The cases are numerous in which § 362(d)(2) relief has been provided within less than a year from the filing of the bankruptcy petition. And while the bankruptcy courts demand less detailed showings during the four months in which the debtor is given the exclusive right to put together a plan, see 11 U.S.C. §§ 1121(b), (c)(2), even within that period lack of any realistic prospect of effective reorganization will require § 362(d)(2) relief. (internal citations omitted).

At the hearing, Rialto presented evidence that the debtor would be unable to propose a feasible plan at the confirmation hearing, and also that any plan proposed by the debtor would likely require another reorganization or refinancing later down the road. A financial expert testified on behalf of Rialto that the appropriate rate of interest for the debtor's chapter 11 plan would be between 11-12%. The expert submitted a report outlining his methods and calculations. In this report, he stated that the debtor could not propose a feasible plan. Based on this expert report and the debtor's current operating revenues, Rialto contends that it could not be treated fair and equitably under any proposed chapter 11 plan. The debtor argues that this rate of interest is too high, and the appropriate rate should be closer to 8.5%. The debtor maintains that with an interest rate lower than 11-12% the debtor would be able to propose a feasible plan.

The court finds that Rialto's financial expert's testimony was credible but not dispositive. His analysis of how the current market would price this loan is sound, but in fact demonstrates that there is no effective market for this loan to date. There is always a price at which someone

would make a loan, but <u>Till v. SCS Credit Corp.</u>, 541 U.S. 465 (2004), requires there be an "effective market" for the market rate to control.  Concluding that there is no market, the court will turn instead to <u>Till</u>'s formula approach to construct a rate.  "The appropriate size of that risk adjustment depends, of course, on such factors as the circumstances of the estate, the nature of the security, and the duration and feasibility of the reorganization plan." <u>Id.</u> at 479.  Secondary factors include the loan to value ratio and quality of the guarantors. The final rate is determined by the plan before the court at confirmation. For purposes of this motion, the court concludes that a risk adjustment of 3 to 5% above prime will be required, depending on the final facts as they appear at confirmation.

The debtor contends that it will be able to propose a feasible plan with an interest rate close to the one expressed by the court at the confirmation hearing. At the hearing, the debtor presented projections under different plan scenarios.  Based on the various plan proposals, it is obvious that in addition to the stream of rent payments received from the property each month the debtor will also need to use Rialto's cash collateral to fund its plan.  Rialto argues that the debtor should not be permitted to use its cash collateral pre or post-confirmation because its interest in the debtor's post-petition rents is not adequately protected and the debtor will not be able to provide Rialto with the rent's indubitable equivalent post-confirmation.  The debtor contends that a replacement lien on the post-petition rents will adequately protect Rialto's security interest.

Pursuant to § 363(c)(2) of the Bankruptcy Code a debtor may use, sell, or lease cash collateral, but only if the entity that has an interest in the cash collateral consents, or the court authorizes such use.  11 U.S.C. § 363(c)(2).  The parties have stipulated that the rental income

derived from the property is Rialto's cash collateral.  Therefore it follows that in order to use the rent, the debtor must either have the consent of Rialto or an order from the court.  Section 363(e) of the Bankruptcy Code provides that a secured creditor can condition a debtor's post-petition use of cash collateral on the receipt of adequate protection.  11 U.S.C. § 363(e).  Adequate protection pursuant to § 361 of the Bankruptcy Code may be provided by:

> (1) requiring the trustee to make a cash payment or periodic cash payments to such entity, to the extent that the stay under section 362 of this title, use, sale, or lease under section 363 of this title, or any grant of a lien under section 364 of this title results in a decrease in the value of such entity's interest in such property;

> (2) providing to such entity an additional or replacement lien to the extent that such stay, use, sale, lease, or grant results in a decrease in the value of such entity's interest in such property; or

> (3) granting such other relief, other than entitling such entity to compensation allowable under section 503(b)(1) of this title as an administrative expense, as will result in the realization by such entity of the indubitable equivalent of such entity's interest in such property.

11 U.S.C. § 361(1)-(3).  Generally, a debtor may use cash collateral to reasonably maintain the property.  In Travelers Insurance Company v. River Oaks Limited Partnership, 166 B.R. 94, 98 (E.D. Mich. 1994), the court stated,

> [c]ourts addressing the right to use a portion of the rental income for necessary expenses of operating and maintaining the rental property seem to authorize such use . . . . [W]here a secured creditor is undersecured and the debtor cannot otherwise provide the adequate protection required under § 363, the cash collateral can be used pursuant to § 506(c). This approach has been interpreted as an "exception" to the adequate protection requirement of § [363].

Pursuant to § 506(c) of the Bankruptcy Code,

> The [debtor in possession] may recover from property securing an allowed secured claim the reasonable, necessary costs and expenses of preserving, or disposing of,

16

> such property to the extent of any benefit to the holder of such claim, including the payment of all ad valorem property taxes with respect to the property.

11 U.S.C. § 506(c). Rialto ultimately benefits from the debtor continuing to maintain and preserve the property. Therefore, the debtor may use the rents to reasonably maintain and preserve the property pursuant to § 506(c).

The next issue is whether the debtor may use the cash collateral to pay expenses beyond what it is allowed to pay pursuant to § 506(c) of the Bankruptcy Code. Specifically, the question is whether the debtor can use Rialto's cash collateral to pay administrative expenses of the estate or to fund plan payments to other creditors. The court stated in In re Griswold Building, LLC, 420 B.R. 666, 699 (Bankr. E.D. Mich. 2009), that,

> A creditor that holds both a mortgage on real property and a security interest in rents has two distinct security interests. Where [ ] there is a specific assignment of rents given as security, a diversion of any portion of the rents to a party other than the secured party is clearly a diminution of the secured party's interests in the assignment of rents portion of the security. To protect against that diminution in value, a debtor must provide adequate protection for the interest in rents above and beyond any adequate protection for the interest in the real property. . . . Any such decrease attributable to the [d]ebtor's usage, therefore, must be protected by cash payments from another source, an additional or replacement lien, or other such indubitable equivalent. (internal quotations and citations omitted).

It is clear from In re Griswold that using the post-petition rents to fund plan payments would result in a diminution in value of the creditor's security interest. Therefore, a security interest in post-petition rents must be adequately protected in its own right.

In River Oaks, 166 B.R. at 97, the court stated,

> While case law suggests that the rents generated from a rental building, i.e. cash collateral, may be used for the operation and maintenance of such building, that principle does not, in this Court's opinion, mean that using such cash collateral to operate and maintain the property necessarily constitutes adequate protection under § 363.

17

Thus, the fact that the debtor can use some of the post-petition rents under § 506(c) does not mean it can automatically use the post-petition rents for other expenses beyond § 506(c). If the debtor seeks to use the secured party's collateral post-confirmation to fund its plan then the debtor must provide the secured party with the collateral's "indubitable equivalent." In re Griswold Bldg., LLC, 420 B.R. at 699.

The debtor argues that a replacement lien and adequate protection payments would adequately protect Rialto's interest in the post-petition rents. The Bankruptcy Code treats rental income as "a special kind of collateral." In re Union-Go Dairy Leasing, LLC, No. 10-01703-AJM-11, 2010 Bankr. Lexis 1468, *10 (Bankr. S.D. Ind. May 6, 2010). Generally, "a secured creditor's security interest in cash collateral generated postpetition is cut off as of the petition date by § 552(a) of the Bankruptcy Code." Id. In this situation the debtor can adequately protect the creditor's interest by offering a replacement lien on the cash collateral generated post-petition because the creditor no longer has a security interest in the collateral pursuant to § 552(a). "However, a prepetition security interest in rents of property subject to a security agreement entered into prior to the petition date continues in full force and effect postpetition by virtue of § 552(b) of the Bankruptcy Code." Id. The issue becomes whether a replacement lien on the post-petition rents would adequately protect the creditor's cash collateral. Virtually every case addressing this issue has held that the proffer of a replacement lien on post-petition rents is illusory by virtue of § 552(b) of the Bankruptcy Code. See In re Buttermilk, 442 B.R. 558 (holding that a replacement lien on post-petition rental income is not adequate protection to the creditor for the debtor's use of the rents); In re Griswold Building, LLC, 420 B.R. 666 (same holding); River Oaks, 166 B.R. 94 (same holding); In re Union-Go Dairy Leasing, LLC, 2010

18

Bankr. Lexis 1468 (same holding).  It is clear from these cases that giving a replacement lien on post-petition rents is not adequate protection or the indubitable equivalent of the post-petition rents.

The facts of <u>Buttermilk</u> and <u>Griswold</u> are very similar to the present case.  The debtor in <u>Buttermilk</u> was in the business of subleasing commercial space and its sole income was derived from tenants who paid rent to the debtor.  <u>In re Buttermilk</u>, 442 B.R. at 560.  The debtor and a lender entered into a construction financing agreement.  <u>Id.</u>  As security for their agreement, the debtor executed a mortgage and an assignment of rents and subleases in favor of the lender.  <u>Id.</u>  The debtor defaulted on the agreement and subsequently filed for relief under chapter 11 of the Bankruptcy Code.  <u>Id.</u> at 561.  The debtor filed a motion to use cash collateral, consisting solely of the rents, to pay professional fees.  <u>Id.</u> at 565.   The lender argued that it was not adequately protected because there was no equity in the property and the lender already had a lien on the rents.  <u>Id.</u>  The debtor argued that the lender was adequately protected because it had a replacement lien on the rents.  <u>Id.</u>  On appeal the Sixth Circuit held that a replacement lien on rents was not adequate protection when the lender had an independent security interest in the rents.  <u>Id.</u> at 567.

The debtor in <u>Griswold</u> owned and operated an office building and parking garage.  <u>Griswold</u>, 420 B.R. at 671.  The debtor entered into an agreement with the lender to refinance the premises. <u>Id.</u> at 671-72.  The lender was secured with mortgages which each contained an assignment of rents and leases provision.  <u>Id.</u> at 672.  The debtor defaulted and subsequently filed a chapter 11 bankruptcy petition.  <u>Id.</u>  The debtor proposed to fund its chapter 11 plan with post-petition rents, and offer the lender a replacement lien on the post-petition rents as adequate

protection for its interest. Id. at 700. The court held that a replacement lien in the post-petition

rental income was not sufficient adequate protection. Id. at 701. The court also found that the

plan could not be confirmed under 11 U.S.C. § 1129 because the plan's interest rate was too low,

the debtors would be unable to make plan payments without the post-petition rents, and the plan

was not fair and equitable under 11 U.S.C. § 1129(b)(2). Id. at 710-11.

   For the debtor in this case to use the net rental proceeds for expenses beyond § 506(c) of

the Bankruptcy Code, including Rialto's cash collateral held by the attorneys as a retainer, the

debtor must provide Rialto with adequate protection. Here, like in Buttermilk and Griswold,[3]

Rialto is not adequately protected with a replacement lien on post-petition rents. The debtor

cannot give Rialto a replacement lien on the post-petition rents because Rialto already has a

post-petition lien on the rents pursuant to § 552(b) of the Bankruptcy Code. Because Rialto has

a security interest in both pre-petition and post-petition rents, the debtor is prohibited from using

Rialto's cash collateral to pay expenses beyond § 506(c) of the Bankruptcy Code unless the

debtor can provide Rialto with adequate protection for its interest in the rental income. The

debtor must find another way to adequately protect Rialto's security interest in the rents.

   Based on the debtor's proposed projections, the court finds that Rialto is not entitled to

relief from stay under § 362(d)(2) of the Bankruptcy Code. There is a reasonable likelihood of

reorganization here. The debtor has met its burden of showing that it has a true prospect of

reorganization. Similar in structure to virtually every chapter 11 plan involving a single asset

real estate debtor, the debtor's property in this case will provide the stream of payments

---

   [3] This case can be distinguished from Griswold, to some extent, on procedural grounds.
The debtor in this case, unlike the debtor in Griswold, has not had a confirmation hearing.
Section 362(d)(2) requires the debtor to show a true prospect of reorganization, not propose a
plan that can be immediately confirmed.

necessary to fund the plan.  Under the debtor's projections, Rialto's cash collateral would also be used to help fund the plan.  Evidence presented at hearing suggests that Rialto's cash collateral and the  stream of payments from the property are sufficient to fund a chapter 11 plan, thus allowing the debtor to effectively reorganize.  As stated previously, the debtor would only be permitted to use Rialto's cash collateral  to fund the plan if the debtor can show it has adequately protected Rialto's security interest in the rents at the confirmation hearing.  It is not the court's obligation to fashion what this adequate protection must be, only to conclude that it must pass muster for any plan to be confirmed.  Notably, while there has been a complete default by the debtor, both the debtor and Rialto agree that the debtor's shopping center is in good operating condition.  The facilities are well maintained and not deteriorating aesthetically or in value.  Additionally, the debtor has acquired two new tenants post-petition, and is in the process of procuring prospective tenants.  The debtor also offered evidence at the hearing that the debtor is very interested in reorganization.  Therefore, relief from the automatic stay pursuant to § 362(d)(2) is not warranted.

Rialto also argues that it is entitled to relief from stay for cause pursuant to § 362(d)(1) of the Bankruptcy Code because its interest in the debtor's rental income is not adequately protected.  Since the debtor is prohibited from using the cash collateral for expenses beyond § 506(c) of the Bankruptcy Code,  Rialto's interest is not declining in value.  Therefore the court finds that cause does not exist under § 362(d)(1) to grant relief from the automatic stay.

Based on the foregoing, Rialto's motion to lift the automatic stay is **DENIED**.

## **MOTION FOR TURNOVER OF POST-PETITION RENTS HELD BY RIALTO**

The debtor contends that Rialto improperly withheld rental income from the debtor.  A

bankruptcy estate is comprised of "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1).  Pursuant to § 542(b)

> [e]xcept as provided in subsection (c) or (d) of this section, an entity that owes a debt that is property of the estate and that is matured, payable on demand, or payable on order, shall pay such debt to, or on the order of, the trustee, except to the extent that such debt may be offset under section 553 of this title against a claim against the debtor.

11 U.S.C. § 542(b).  The debtor argues that Rialto currently holds pre-petition and post-petition rents that are property of the estate and are subject to turnover pursuant to § 542(b) of the Bankruptcy Code.  As stated previously, Rialto has a security interest in the pre-petition and post-petition rents.  The parties agreed that the rents are Rialto's cash collateral.  The debtor has not demonstrated how it will adequately protect the use of those rents.  Currently, the debtor is receiving rents that are sufficient to pay the operational costs of the debtor.  Therefore the motion for turnover of rents held by Rialto is **DENIED**.

## MOTION TO EMPLOY AN ACCOUNTANT AT A FLAT FEE

Finally, the debtor seeks permission to employ an accountant at a flat fee.  This motion was uncontested.  Therefore, the motion to hire an accountant is allowed and a flat fee is approved.  However, this does not constitute an authorization to pay an accountant for the estate out of the cash collateral.

## END OF DOCUMENT